UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
UNITED STATES OF AMERICA

      v.                                              Case No. 1:23-CR-35-3 (RC)

TROY WEEKS,

                          Defendant.

## SENTENCING MEMORANDUM ON BEHALF OF TROY WEEKS

**HACKER MURPHY, LLP**
James C. Knox, Esq.
*Attorney for Defendant Troy Weeks*
Admitted *Pro Hac Vice*
28 Second Street
Troy, NY  12181
(518) 274-5820

## INTRODUCTION

Troy Weeks, aged 38, stands before the Court for sentencing pursuant to his plea of guilty to counts 1, 6, 10, 12, 14, and 16 of the Superseding Indictment: Civil Disorder, in violation of 18 USC § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a)(1); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 USC § 1754(a)(4); and Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 USC § 5104(e)(2). Mr. Weeks has no prior criminal history, he has fully accepted responsibility, he and asks that this Court sentence him below the recommended Guideline range.

## FORMULATING A FAIR SENTENCE

It is now black letter law that the Guidelines are advisory and are simply one consideration among many sentencing factors and that 18 U.S.C. §3353(a) provides the framework and the criteria which the Sentencing Judge must consider. At the end of the analysis the punishment must be just and fair and must meet the fundamental dictate for federal sentencing that the sentencing process shall result in: "a sentence sufficient but not greater than necessary" to achieve the goals of a fair, proportionate, balanced and just sentence.

The factors set forth in 18 U.S.C. § 3553, along with the purposes and goals of sentencing outlined therein, when applied to Mr. Weeks and the facts of this case, weigh in favor of the conclusion that the goals of sentencing, proportionate punishment, general and specific deterrence, and rehabilitation are fully, fairly and reasonably served by a below-guidelines sentence.

**NATURE AND CIRCUMSTANCES OF THE OFFENSE**

Mr. Weeks has accepted responsibility and the facts surrounding and describing the nature and circumstances of his offense conduct were set forth in detail in the Statement of Offense that formed part of the plea agreement in this case.

Like many others present at the Capitol on January 6, 2021, Mr. Weeks had traveled to the District of Columbia out of patriotic motivations. Once present, again like so many others, he became caught up in the crowd and a series of foolish choices that led to his criminal conduct. In many ways, the government would separate all of Mr. Weeks' actions from those of others and discuss those actions as though they happen in isolation, free of any external influence. On the other hand, the government would also burden Mr. Weeks with the actions of all of the other rioters. The psychological reality of being present in a crowd such as was present at the Capitol on January 6 is that it is easy to get caught up in the actions of others, whose cumulative transgressions created a permission structure that led many – like Troy Weeks – onward and into the Lower West Terrace entrance, known as the tunnel. For example, while the government makes much of a still image showing Mr. Weeks standing near an "Area Closed" sign (Dkt. 262, at pg. 4), the government ignores the reality that the same photo shows hundreds of people ahead of and streaming past the sign. While defendant does not now argue that the area around the Capitol was open, the plain reality is that, for a person on the ground that day, the significance of the sign was clearly diminished by the overwhelming presence of the crowd beyond it.

The nature of such a human event is that people like Mr. Weeks now find they participated in something wrong which they never originally intended to be a part of. Notably, there is no evidence in this case whatsoever of any premeditation by Mr. Weeks, because his

actions at the Capitol were not premeditated. There are no social media postings, texts, emails, tweets, or any other evidence, written or recorded, that Mr. Weeks marched to the Capitol intending ahead of time to participate in a riot. This fact necessarily separates him from all those defendants who traveled to the Capitol with the original intent of disrupting the certification process at the Capitol.

Mr. Weeks made his way to the Lower West Terrace and, to his great cost, made the ill-fated decision to work his way to the front of the crowd of protesters. While the government implies that people entering the tunnel knew that rioters were assaulting police, the dense crowd, choked by pepper spray, shouting and generalized chaos, reduced an individual's ability to know what lay ahead. None of this makes it right for Mr. Weeks to join the crowd in the tunnel in its collective effort to push forward, but the government's analysis does not acknowledge that the scene in the tunnel was chaotic and confused for those within.

The essential element of obstruction, impeding or assaulting police occurred when Mr. Weeks grabbed at – and for less than one second had a grip on – a police officer's can of pepper spray. The government has directed the Court to its Exhibit F at timestamp 00:26 through 00:28. The video is instructive because it shows that Mr. Weeks' was behind the protester whom the government refers to as "the man experiencing a medical emergency" (Dkt. 262, pg. 10), and Mr. Weeks was hardly able to see what was ahead of him or what he was doing. In fact, a fair review of the videos showing the distressed man – a bald man in a red shirt – demonstrates that man was struggling to breathe, and it is clear that this was a result of pepper spray. The videos also collectively show that, at the same time that police were spraying protesters with pepper spray, protesters were spraying pepper spray from further back in the tunnel. (See e.g. Exhibit G, at

00:43- 00:49; Exhibit H, at 00:24-00:30). The distressed man, Mr. Weeks, and others near the front of the line of protesters were literally being hit from both sides by pepper spray, and Mr. Weeks was affected by that double-dose.

Yes, Mr. Weeks did grab blindly at the officer's pepper spray and, yes, his hand did lock onto it for a split second. Mr. Weeks pled guilty to doing that. He agrees this action impeded or obstructed the officer. But Mr. Weeks' actions are very different from those protesters who struck at officers with their firsts, sticks, shields or other objects. Mr. Weeks did not act to harm anyone. Once he reached the front of that line, Mr. Weeks had found himself in harm's way – albeit a situation he plainly had only himself to blame for being in.

Nevertheless, the reality is that Mr. Weeks was crushed from behind and from the front. The pressure of the crowd was such that he could not move forward or backward. (Exhibit G, at 00:20 – 00:24). He was inhaling capsicum spray, and he was having difficulty breathing, just moments after he had grabbed at the can. (Exhibit I, at 00:25-00:50, showing a time stamp of approximately 90 seconds after he grabbed at the can the second time). He did not come to the Capitol, like others had, equipped with a mask, goggles, or breathing apparatus, or even with a bottle of water to wash pepper spray off. He had been punched in the side of the face (Exhibit G at 00:24 – 00:30). Pepper spray had taken its toll, and he showed signs of respiratory and general distress. (Exhibit H, at 00:30-00:32). Of course, nothing is wrong with police using pepper spray to attempt to control a crowd, and Mr. Weeks does not contend otherwise.

However, a fair analysis of the situation from the defendant's individual perspective must include an acknowledgement that Mr. Weeks clearly got far more than he bargained for, more than he ever intended to encounter, even if it was not less than he deserved. But in attempting to

5

ascertain how a man like Mr. Weeks, who has never been in trouble in his life, found himself at odds with Capitol police in the tunnel on January 6, some recognition must be made of the fact that these choices, while his own, were ones which led to consequences far beyond what he individually intended.  All of Mr. Weeks' activity in the tunnel lasted barely 4 minutes, during which time he never struck any officer, injured any officer, or committed any act of violence, other than generalized pushing.

The government makes much of Mr. Weeks' time after leaving the tunnel, saying that he was not experiencing a medical emergency because he stayed on the Capitol ground for two more hours.  Mr. Weeks' distress when covered in pepper spray had of course abated by then, as he been handed a bottle of water when he exited the tunnel and had rinsed the pepper spray from his face.  Remaining on the ground was wrong.  Mr. Weeks does not dispute that, but the criminality of his remaining conduct beyond the tunnel is, in all reality, limited to his presence. While the government variously claims that he "taunted" and "mocked" officers (which implies a tone largely belied by the referenced exhibits), and claimed that he "defiantly stood" on Capitol grounds (Dkt. 262, pg. 14-15), the obvious conclusion is that once Mr. Weeks left the tunnel, his conduct, while not admirable, was minimally serious.  Notably, unlike many others, Mr. Weeks did not brag about his conduct on social media, or otherwise attempt to publicly glorify conduct which he knew upon reflection had been a grave mistake.

### A BELOW-GUIDELINES SENTENCE IS MORE THAN SUFFICIENT TO MEET THE GOALS OF FEDERAL SENTENCING.

Mr. Weeks has never been in trouble in his life.  He is a simple man who has led before and since January 6, 2021, a quiet life.  He works in a job in quality control for a Fortune 500 company, which he obtained during the pendency of this case.  During the time this case has

6

been pending, Mr. Weeks has undergone significant technical training and gained numerous certifications to analyze materials at the sub-microscopic level for quality.  He has put in 1,600 hours to become a certified level II Non-Destructive Testing Radiographer – an X-ray technique which looks for hidden imperfections in products and components.  He has earned approximately $20,000.00 in potential retirement benefits during this employment – which is not vested and which he stands to lose if incarcerated or otherwise unable to continue is his job.  Mr. Weeks is also taking classes at Schenectady County Community College, and the semester ends on December 16, 2024.  Mr. Weeks is enrolled in classes totaling 15 semester credit hours.  If incarcerated before then, he will be unable to complete the semester and will lose both the costs of enrollment and the sunk costs of the work he has put into his classes thus far.

      Mr. Weeks accepted responsibility by pleading guilty to all the offenses with which he was charged.  Mr. Weeks is remorseful for his actions, for the harm caused by him individually and the group of protesters collectively, and he has been working to understand how he now finds himself before a federal court facing sentencing, while ensuring that this is the only time in his life he is so positioned.

      Here the government seeks a sentence of 27 months.  This would be excessive, especially in comparison to other defendants with similar conduct.  For example, in *U.S. v. Ricky C. Willden*, (Case No. 21-cr-423), the defendant received a sentence of 24 months, with conduct far more egregious than that of Mr. Weeks.  Mr. Willden was a self-admitted Proud Boy who actually entered the Capitol.  Mr. Willden, equipped with goggles to protect himself from pepper spray, sprayed six (6) or more police officers with a chemical irritant he had with him in the process of entering the Capitol, then threw the empty can at them.   Mr. Willden then bragged

about his conduct on Facebook and destroyed evidence he had created in the form of videos of his and others' conduct which he had recorded on his phone. See Case No. 1:21-cr-423, Dkt. 38. Even though that defendant destroyed evidence, injured officers with what the government fairly called violent conduct, and bragged about it afterwards, the government in that case only sought a sentence of 30 months – just 3 months more than it now asks this Court to impose upon Mr. Weeks. The Court imposed the minimum Guidelines sentence. Mr. Weeks' conduct clearly falls far below that of Mr. Willden.

      A large basis of their argument rests on the fact that Mr. Weeks' brother recently received a 27-month sentence. The conduct of James Weeks is different than that of his brother. A close examination of that docket would make clear that the admitted conduct by each defendant is not fairly comparable. The government in its memorandum in this case notes now raises conduct by James Weeks which Troy Weeks did not commit, and was not part of, and implies that this Court should sentence Troy Weeks for James Weeks' actions. This makes little sense. Mr. Weeks was not indicted with his brother, and the government's decision to now ask for an equivalent sentence seems unjustifiable. Troy Weeks should not be held accountable for the actions of his brother.

      In this offense, Mr. Weeks' conduct was minimal. For the average defendant convicted of assaulting, impeding or obstructing an officer in a January 6 case, there is usually present conduct that anyone would commonly understand as an assault. Most such charged defendants tried to hurt an officer by striking at them with fists, feet or objects. Mr. Weeks' conduct falls most squarely in the impeding category. While any such conduct qualifies as criminal, obviously impeding an officer in the way Mr. Weeks did is less serious conduct than that of a defendant

who struck an officer, intending to hurt the officer. His sentence should reflect that difference.

As Probation has noted, the average length of imprisonment for a defendant with Troy Weeks' sentencing posture has historically been 19 months. That average excludes defendants who received no prison sentence, the inclusion of which would lower the average sentence to 17 months. Mr. Weeks is deserving of a below-average sentence. Mr. Weeks has demonstrated, through his conduct until January 6, 2021, and since that date, that he is not a person who is likely to offend. This experience has left him absolutely unlikely to ever reoffend. His conduct while on supervised release shows that a sentence of probation supervision would be more than sufficient to guarantee that he will not reoffend, and will remain the productive member of society which he has shown himself to be, other than in this particular case.

## REQUEST FOR SELF-SURRENDER

Mr. Weeks has obeyed all the conditions placed upon him during his time under pretrial supervision. Probation has advised the Court that Mr. Weeks is a good candidate for self-surrender, and that he does not present either a risk of flight or a danger to the community (Dkt. 260, pg. 3). It is notable that Probation recognizes that Mr. Weeks is not a danger, and this fact should weigh in the Court's determination as to the need for specific deterrence.

## CONCLUSION

The essence of a criminal conviction for a first-time offender is that it demarcates the point in that person's life when he or she stepped beyond the bounds of lawful behavior and is held to account for it. Mr. Weeks has regret and would gladly undo his actions if possible. For Troy Weeks, he does not need prison to ensure that he will never appear before another judge for sentencing.

DATED:  September 25, 2024

                                                Respectfully submitted,

                                                HACKER MURPHY, LLP

                                                /s/ James C. Knox
                                                JAMES C. KNOX, ESQ.
*Attorney for Defendant Troy Weeks*
Admitted *Pro Hac Vice*
28 Second Street
Troy, New York 12181
(518) 247-5820